# EXHIBIT 2

```
* * * * * * * * * * * * *  * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
                          *
INTERNATIONAL BROTHERHOOD *    ARBITRATION DECISION
   OF TEAMSTERS, LOCAL 170 *    (Joan G. Dolan, Arbitrator)
                          *
        and               *
                          *
                          *    GRIEVANCE: Health Insurance
QUALITY BEVERAGES         *
                          *
AAA No. 01-17-0004-3570   *    AWARD DATE: February 24, 2018
                          *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

## AWARD

      The undersigned arbitrator, having been designated in accordance with the arbitration agreement entered into by the above-named Parties, and having duly considered the proofs and allegations of the Parties, awards as follows:

      1.) This grievance is a continuing violation which was timely filed on April 24, 2017;

      2.) The Company violated Article 13.6 of the collective bargaining agreement commencing in the Fall of 2014 and continuing up to the new contract effective May 22, 2017;

      3.) In accord with continuing violation procedures, the Company shall return to employees who paid them health plan overpayments beginning eight days before the April 24, 2017 grievance filing and continuing through whatever period of medical insurance coverage employees were entitled to until the 2017-2022 collective bargaining agreement became effective.

_____
Joan G. Dolan, Esq.
Arbitrator

# TABLE OF CONTENTS

**AGREED ISSUES.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1.**

**STATEMENT OF THE CASE.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2.**

**RELEVANT 2012-2017 CONTRACT PROVISIONS** . . . . . . . . . . . . **2.**

**FACTUAL BACKGROUND.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5.**

**PARTIES' POSITIONS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12.**

**OPINION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17.**

**AWARD.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22.**

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
                                    *
INTERNATIONAL BROTHERHOOD           *   ARBITRATION DECISION
    OF TEAMSTERS, LOCAL 170         *   (Joan G. Dolan, Arbitrator)
                                    *
          and                       *
                                    *   GRIEVANCE: Health Insurance
QUALITY BEVERAGES                   *
                                    *
AAA No. 01-17-0004-3570             *   AWARD DATE: February 24, 2018
                                    *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

The parties presented this case on November 7, 2017 at a hearing held in Taunton, Massachusetts. Attorneys Gregory Benoit and Alyssa Jankowski represented the Union. With them were Business Agent Sean Foley, Secretary-Treasurer Shannon George, and Driver/Stewards Chad Texeira and Brandon Paradise. Arthur Murphy, Esq. and Law Clerk Kimberley Brunner appeared for the Company. Also attending for the Employer was Executive Vice President - Chief Operating Officer Theodore Audet.

All witnesses were sworn, and both sides had full opportunity to present documents and oral evidence from those they wished to examine and cross-examine. Briefs were filed on January 5, 2018.

## <u>AGREED ISSUES</u>

    1.) Is the grievance timely filed?
    2.) If so, is the Company in violation of the collective bargaining agreement, specifically Article 13.6, commencing in the Fall of 2014 and continuing up to the new contract effective May 22, 2017?
    3.) If so, what shall be the remedy?

## STATEMENT OF THE CASE

There are two issues here. The first is the procedural arbitrability question of compliance with the contractual grievance filing requirements.  The second involves the Article 13.6 medical insurance clause that contains limitations on the amounts of employee health insurance costs.  The Union contends that the Company did not comply with those limitations, a position Quality Beverages disputes.

## RELEVANT 2012-2017 CONTRACT PROVISIONS

### ARTICLE 2
### EMPLOYEES COVERED

2.1 The Company recognizes the Union as the sole and exclusive bargaining agent for all its warehouse employees, helpers, floormen and stockmen, fork truck operators, checkers and drivers, and as a separate classification all full-time and regular part-time can operators but excluding clerical employees and supervisory personnel with respect to wages, hours and other conditions of employment.

### ARTICLE 3
### MANAGEMENT RIGHTS

3.1 The Employer reserves all traditional management rights except to the extent that such rights may be modified or restricted by the specific terms of this Agreement. The management of the business and the direction of the work force, including but not limited to the right to plan, direct, and control all operations or services to be performed by employees, to schedule working hours, to hire, promote, demote, and transfer, to suspend, discipline, or discharge for just cause, to relieve employees because of lack of work or for other legitimate reasons, to make, publish, and enforce reasonable rules and regulations, to introduce new or improved methods, materials, products, or facilities are the exclusive function of management limited only by the express language of this Agreement; provided, however, that such rights shall not be exercised in a manner contrary to or inconsistent with the terms

of this Agreement or existing law.

## ARTICLE 8
## PROTECTION OF RIGHTS

8.1 Individual Agreements.

   The Employer shall not enter into any agreement or contract with his employees, individually or collectively, which in any way conflicts with the terms and provisions of this Agreement. Any such Agreement or contract shall be null and void. All employees shall work in accordance with this Agreement. The Employer recognizes and acknowledges this Agreement.

8.2 Right to Representation by Union

   No Employee covered by this Agreement shall be requested to attend any meetings at which hours, wages or working conditions are to be discussed without a Business Agent or the Secretary-Treasurer of the Union being present.

## ARTICLE 13
## HEALTH AND WELFARE PLAN

   13.1 The Employer will provide life insurance, medical coverage and a disability plan on the following basis for eligible employees.

   13.6 The employee contribution for the above health plan shall be $59.00 per week per employee for the family plan and $43.00 per week for the individual plan. This will increase annually by $4.00 per week for both family and individuals up to a maximum of 20% of the premium. The first $4.00 increase will take place on the first payroll paid subsequent to ratification of the contract. Subsequent increases will take place on May 19th of each calendar year. Employees enrolled into the plan after May 19, 2007 will contribute 20% of the total cost. Employees hired after May 19, 2012 will contribute 25% of total cost. The Company may change medical, dental, and eye care plans so long as it is to the same plan available to the non-Union employees.

## ARTICLE 19
## GRIEVANCE AND ARBITRATION

19.1 Purpose

The purpose of this article is to provide the sole method for settlement of complaints raised by any employee alleging that a specific provision of this Agreement has been violated and thereby has deprived the employee of a right or benefit herein expressly conferred upon him/her by this Agreement. Such a complaint shall be defined as a grievance under this Agreement and must be presented and processed in accordance with the following steps, time limits and conditions herein set forth.

19.2 Process

Such grievances as may arise under the terms of this Labor Agreement and [sic] must be processed in the following manner:

Step 1. The employee will confer informally with his designated supervisor within three (3) calendar days of the incident giving rise to the grievance. If there is no resolution of the dispute at this level, the grievance shall be reduced into writing and submitted by the Union to Step 2 within five (5) calendar days, or no longer than eight (8) days after the incident.

19.4 Arbitrator's Authority

The arbitrator shall have no authority to add to, subtract from, modify, change, alter, or ignore in any way, the provisions of this Agreement or any expressly written amendment or supplement thereto. The award of the arbitrator so made, shall be final and binding on the parties.

19.6 Effect of Time Limits

The parties agree that they will follow the foregoing steps, time limits, and conditions contained therein. If, in any step, the Employer's representative fails to give a written answer within ten (10) days of the receipt of the grievance, the answer shall be deemed to be denied; the grievance then may be appealed to the next step at the expiration of such time limit. If the employee or the Union fails to follow the foregoing grievance procedure in accordance with the steps, time limits, and conditions contained therein, the grievance shall be deemed null, void and waived. The parties may extend the time limits by mutual agreement.

# FACTUAL BACKGROUND

## The Situation Before the Events in this Case

Quality Executive Vice President and Chief Operating Officer Ted Audet gave a brief overview of the history of medical insurance plans at the Company. He said that it had participated in the Union's Health and Welfare fund prior to 1996. During that year it began to offer health insurance through another provider. The Company and the Union agreed during 1996 negotiations that Quality could change plans if the new plan was a similar one. In 2002, they changed that language to new language saying that medical, dental, and eye care plans could be changed so long as it was to the same plan available to the non-Union employees.

Prior to the new plan, there had been only one medical insurance plan at the Company. All Union employees were enrolled in it unless they opted out. Employees' contributions were limited as set out in Article 13.6 of the 2012-2017 collective bargaining agreement.

In terms of the Union, current Business Agent Sean Foley did not assume this post until January 1, 2016. He knew nothing about the medical plan history or situation at Quality before he arrived. There is no information about his predecessor in the record.

## The New Plan

In 2014, the Company learned that the Blue Cross Blue Shield medical insurance plan premiums were to be increased by 11%. It set out to find alternative plans that would not be so costly to the Company but still provide employees with benefits comparable to the existing plan.

Quality located another Blue Cross Blue Shield plan that it referred to as the base plan. It would cost $5 dollars a week less for individuals and $11 a week less

for families who chose  to remain in the Company plan. They could "buy up" and choose an alternative, which was what the Company called the premium plan. The main difference between the two plans was that there was no deductible amount in the premium plan, but a $1,500 individual or $3,000 family deductible in the base plan. Quality said that it would pay half of the deductible amount. It also advised employee that they could opt to go back into the base plan if they chose the premium and then wished to change.

On September 12, 2014, there was a meeting of the Union employees about the changes in the health plan. The Company did not invite either the Union Business Agent or Secretary-Treasurer to this meeting. It also did not give Business Agent Foley notice of the new plan or an opportunity to bargain over it. At least one other employee meeting was held at some point. Mr. Audet testified that in 2007 the Company had changed carriers to Blue Cross Blue Shield. At that time, it did as it did here, which was to hold an employee meeting and send letters to all health plan members.

State law requires annual medical insurance plan notice to employees. Bargaining unit employees received brochures and letters from both the Company and Blue Cross Blue Shield each year explaining the changes in the health coverage, their options, and the amount of their premium for the upcoming insurance year. Mr. Audet emphasized, as did the Company during explanations to the employees, that their choice as to which plan they wanted was voluntary. The employees received their new premium payment figures every year. However, they were never told what premiums Quality was paying Blue Cross, or the cost of their dental and vision plans.

In terms of the Article 13.6 weekly $4.00 increase cap, bargaining unit

members could tell from their paycheck withholding whether that $4 weekly figure was being exceeded. Without the figure of what the Company was paying Blue Cross Blue Shield for each employee's premium, however, it took several mathematical steps for employees to get from their annual contribution to the point where they could figure out what percentage of the total cost they were paying for medical coverage.

As to how the Company viewed and presented the new premium plan to employees but not the Union's Business Agent, the following excerpts from annual employee letters state:

Vice President Audet, September 12, 2014:  Effective October,, 2014, Quality Beverage is changing its medical coverage to a high deductible program. .. A Premium Plan alternative is available at an increased employee contribution. If you wish to have the Premium Plan you must complete an application by September 24th.

Controller Paul Brisson, on upcoming 2015-2016 open enrollment for benefit plans: This is your annual opportunity to enroll in the health plan, change the health plan option you are currently in, or add dependents ... . This year Quality Beverage will continue to offer two medical plans from Blue Cross Blue Shield of Massachusetts (a Base Plan and a Premium Plan) with no significant changes in benefits. Changes in the Employee Contribution to the plan are noted in the Benefits Enrollment Guide.

Mr. Audet, August 2, 2016: Enclosed you will find the 2016-2017 Employee Benefits Information Guide for Quality Beverage for Taunton employees. ...
There are no changes in any program design. The Base Plan employee contribution is increasing less than $1.40 per week for the single plan and under $3.75 per week for the family plan....
The Premium Plan weekly contribution increase Is under $2.20 for the single plan and under $5.90 for the family plan.
... If you wish to change your status [from single to family or vice versa] or change plan choice (Base vs. Premium) please obtain a new enrollment form from your supervisor ... .

All Union employees were automatically enrolled in the base plan. To change to the premium plan, they had to meet with Controller Brisson, unenroll from the

base plan, and enroll in the premium plan. As of May 2017, 17 employees had made

the base to premium plan switch.

## Procedural Arbitrability Facts

Article 13.6 of the May 2012 - May 19, 2017 collective bargaining agreement

says:

> 13.6 The employee contribution for the above health plan shall be $59.00 per week per employee for the family plan and $43.00 per week for the individual plan. This will increase annually by $4.00 per week for both family and individuals up to a maximum of 20% of the premium. The first $4.00 increase will take place on the first payroll paid subsequent to ratification of the contract. Subsequent increases will take place on May 19th of each calendar year. Employees enrolled into the plan after May 19, 2007 will contribute 20% of the total cost. Employees hired after May 19, 2012 will contribute 25% of total cost. The Company may change medical, dental, and eye care plans so long as it is to the same plan available to the non-Union employees.

From the start of the 2014 new two-plan approach, employees in the base plan

apparently did not pay premiums more than the specified $4.00 weekly and 20% or

25% annual cap. As of May 2017, 17 employees had switched to the premium plan.

In terms of the Article 13.6 weekly $4.00 increase cap, bargaining unit

members could tell from paycheck withholding whether that $4 weekly figure was

being exceeded. Without the figure of what the Company was paying Blue Cross

Blue Shield for each employee's premium, however, it took several mathematical

steps for employees to get from their annual contribution to the point where they

could partially figure out what percentage their payments were of the cost of their

policy.

Even if those calculations had been done, however, the employees still would

not have known what premiums the Company was paying for their dental or vision

coverage. Mr. Audet testified that dental cost was about $100 and vision cost about $12 monthly. He also said that the employees do not have access to that cost information.

Mr. Audet said that no employee ever complained to the Company that the premiums he was paying were too high or violated Article 13.6. Business Agent Foley testified to the same effect, with one exception. Mr. Foley said that he had gotten no notice from the Company of what was going on in the health insurance area, but had learned of it through Union Steward Chad Texeira.

The Steward testified that no employee had ever come to him and complained about the premiums violating the contract or that they were too high. He said that he had never figured out what percentage of the total cost he was paying in premiums after his switch to the premium plan, but the agreement was that the premium would not get higher than the 20% or 25% in the contract. When he went into the new plan, he said, his contribution increased to what he thought was his 20% maximum. The witness said that if he had known before 2017 that he was paying more than 20% he would have grieved it and considered going back into the base plan. However, he never knew the total cost of the plan so he stated that he could not figure out what percent of the cost he was paying. He said, "I put my faith in what I was told." Mr. Texeira stated that his old plan had the $4.00 weekly contribution increase limit. He paid $67.00 weekly in 2013, $105.97 in 2014,  $124.89 in 2015, and $130.73 in 2017. assumption was that those figures were 20% of the cost, but he offered no explanation on the $4.00 weekly increase limitation exceeded by these figures.

On April 6, 2017, Mr. Foley sent Mr. Audet a request for the Company cost for both the basic and premium plans. Mr. Audet responded with some handwritten cost figures   and   employee   premium/Company   cost   percentage   figures.   Those

percentages show that employees on the base plan were not exceeding the 20% or 25% for their respective groups by date hired. The situation was different for premium plan payers. The figures Mr. Audet sent Mr. Foley were all written by hand and inserted into a chart on page 1 of the 2016-2017 benefits plan. I cannot decipher two of the six percentages written in the premium family plan columns. The remaining four figures show premiums paid at the rate of either 28% individual or 32% family cost  of the plan.

It should be noted that the 2015-2016 Benefits Overview Guide in the "Weekly Contributions" section contains no mention of dental or vision costs being included in the listing of employee premiums paid. In the same document for 2016-2017, however, this section is entitled  Monthly Contributions for Medical, Dental and Vision (effective October 1, 2016). These are the only documents of this type in the record. There was no evidence on this change either in terms of who had done it  or on the calculation of what charges were included.

In terms of how much money employees paid in premiums beyond the caps listed in Article 13.6, Company Exhibit 12 is a series of tables showing apparently that all employees in all individual and family categories paid either 28% or 32% of the cost of a premium medical plan, the scope of which is not specified on the document. In other words, it does not say whether or not the premium payments listed covered dental and vision as well as medical. The damages on the table are broken into the different affected groups and then totaled. The  total sum of money for 17 members impacted by overpayments is $89,321.16  over the three plan years from 2014 through 2017.

The grievance that led to this arbitration case was filed by Steward Texeira, not the Union, on April 24, 2017. It alleges a violation of Article 13.6 in that the

parties agreed that the maximum employee premium payment would be 20% of the cost but employees were paying 28%. As a remedy, the grievance seeks that all members enrolled in the premium plan be reimbursed for their overpayments from the time of the increases.

Article 19.2 of the collective bargaining agreement states that grievances must be filed "no longer than eight days after the incident" giving rise to them. Article 19.6 says that "If the employee or the Union fails to follow the foregoing grievance procedure in accordance with the steps, time limits, and conditions contained therein, the grievance shall be deemed null, void and waived." The Company has taken the position since shortly after the grievance was filed that it is not arbitrable because there was non-compliance with the filing time limits.

# PARTIES' POSITIONS

## Arbitrability

## Company

Article 19.2 says that grievances must be filed no longer than eight days after the incident giving rise to the grievance. Article 19.6 states that when the Union fails to follow the grievance procedure in accordance with the steps, time limits, and conditions contained therein, the grievance shall be deemed null, void and waived.

The Union did not file a grievance in 2014 when it first knew of the alleged violation. It did not file in 2015 or 2016. It did not  file until April 24, 2017, almost three years after the date employees first learned of the medical coverage and cost changes that are at issue in this case. The allegation that there was no knowledge of employee cost increases until 2017 cannot be accepted in light of the facts.

The Union was well aware that the voluntary premium plan would cost well in excess of the contract rates. The deal was made to accept the new plan and cost increases. People should not be allowed now to try to go back on it. To proceed to deciding the merits would be a clear abuse of the parties' Article 19 agreements that grievances had to be filed within eight days after their precipitating incident, and would be considered null, void, and waived if they were not timely filed.

## Union

There are multiple reasons why this grievance is arbitrable. One is that it was filed within the required eight days after Union Business Agent Sean Foley discovered on April 8, 2017 that employees were paying  more than the contractual percentage limit, and then on April 24 the Company told him that its changes of health plan and its costs were not a violation of the collective bargaining agreement.

The grievance was filed on April 24.  Also, it is a fundamental principle that the

time for filing grievances does not start to run until the affected employee was aware or should have been aware of the alleged violation. As witnesses testified, it was not until April of 2017 that the Union learned about the increased health care premiums in violation of the contract.

Employees who had been paying these costs could not have figured out that they were paying 28% or 32% instead of the 20% and 25% top percentage figures specified in the collective bargaining agreement. The Company could have provided the total monthly premium figure they would have needed to determine the percentage figure the employees were paying, but it chose not to do so.

This case must be seen as a continuing violation since the excessive charges to the employees occurred each week when they paid a rate violating Article 36.1 of the contract. Since May 2014 this has been going on. Unlike a single isolated event, the situation constitutes a recurring pattern of conduct that is repeated from day to day, with each day constituting a new grievance occurrence. In these circumstances, it would be unreasonable to require compliance with the contractual time limits. The April 2017 grievance was timely filed.

Several other fundamental principles are also relevant here. They are that grievances are presumed to be arbitrable. Also, there is a long labor law tradition of favoring arbitration and resolving procedural arbitrability questions in a form that allows the arbitrator to hear the merits of the case. Finally, there is the factor that the parties in this dispute presented testimony on the merits.

## MERITS OF THE DISPUTE

### Union

It is undisputed that employees enrolled into the premium plan after May 19, 2007 paid more than 20% of the total cost of the plan. Those hired after May 19, 2012 paid more than 25% of total plan costs. There are several other disturbing factors about this case

Article 2 recognizes the Teamsters as the sole and exclusive bargaining agent for members of the bargaining unit. Article 8.1 prohibits the Company from entering into any agreement or contract with the employees which in any way conflicts with the collective bargaining agreement. The facts establish that Quality did not meet its bargaining obligations to the Union. It did not invite Local 170's Business Agent or Secretary-Treasurer to a key September 2014 meeting informing employees about the new health insurance plan and their choices under it. It also did not inform Union officials about the Company's planned changes in the insurance plan and the costs involved for employees.

There was also bad faith in withholding information from both employees and Union officials. The Company says that the bargaining unit members should have known what they were paying because of paperwork they received from Blue Cross Blue Shield. With the listed monthly cost of the premium figure, they could then calculate annual cost, then weekly cost, and then multiply that amount by their contractually set percentage. The last step would be to compare that figure with the amount being deducted from their weekly pay in order to determine if they were being overcharged. Business Agent Foley asked the Company to give him the relevant information before the arbitration hearing. It was not produced before the hearing but appeared that day.

The information provided to employees was incomplete in two areas. It showed the weekly employee contribution amount but not the total monthly premium cost of the health insurance plans. Thus, employees were not told the percentage of the premium they were paying so could not figure out whether their percentage paid figures exceeded the contractual 20% and 25% contribution caps.  Even if the members had the information, they would not have been able to discern the true cost of their medical coverage. The figures did not take into account the dental, vision, disability, and life insurance employee contributions.

Article 13.6 was violated. The affected employees should be repaid their overpayments.

### Company

This grievance should be denied if the merits are reached. The evidence clearly shows that the Union fully knew that the Company was offering an optional premium separate plan from  its base plan that might exceed the base plan cost. It agreed and accepted the new plan without filing a grievance. Employees had notice of the potential costs and regularly received multiple written notices. They got annual notices from the insurer, and their weekly pay stubs showed the cost of the plan. With this information in hand, 17 employees chose to take advantage of the new plan option, yet they are now seeking, three years later, to obtain a windfall of returned premium payments. They went into the plan with eyes wide open, and should not now be allowed to seek compensation.

There is the matter of the plain language of Article 13.6. There was only one health plan until the offer of the new plan. Provisions of Article 13 speak of "the above health plan," "the medical plan," "the above health plan," and "the plan." The

Company has continued to offer only one Company plan, the base plan, to all employees and to enroll them in it. Employees who remained in the base plan and did not choose the new plan are not part of this grievance since their contribution costs did not exceed the 13.6 contractual limitations. It is only the employees who chose the premier who paid amounts in excess of those limitations.

There is nothing in the parties' bargaining history that suggests the possibility of any other plan being covered by the collective bargaining agreement. The Union's argument that the contract covers any medical plan whether mandatory or voluntary ignores the reality that the contract references only the base plan. All Union employees who took the premium plan had to take affirmative steps to unenroll in the base plan and enroll in the premium plan, which is not the plan Quality offers.

Quality's practice since at least 1996 has been to offer only one Company health plan, in which every Union employee is automatically enrolled. In 2014, an 11% premium increase was going to happen so Quality decided to change the Company plan in October 2014 from a low deductible to a high deductible plan to be called the base plan. For the first time, employees were also given the chance to sign on for an alternative voluntary plan called the premium plan. It was to be offered in lieu of the Company plan. Employees had to take step to unenroll in the base plan and enroll in the premium plan.

The Company has never deviated from its practice of enrolling employees in its one medical insurance plan. Even though Union employees have the option of choosing between two plans, the Company's practice of offering the Company plan and a voluntary alternative plan is consistent with its practices prior to 2014.

Ths grievance is inarbitrable because of the late-filed grievance. On the merits, the Union should not be allowed to renege on its indisputable agreement and

understanding that the premium plan fell outside the provisions of Article 13.6.

## OPINION

This is a case about which both parties have strong feelings. As will be discussed here, there were indeed problems on both sides.

For the reasons to be mentioned, the evidence and the parties' arguments compel the conclusion that the Company violated Article 13.6. Because of the continuing violations doctrine, Quality cannot prevail in its procedural inarbitrability claim relating to the late filing of the grievance. However, the relief for the violation must be adjusted down to the level required by that doctrine.

### The Article 2 and Article 8 Issues

In Article 2, the Company recognized the Union as the "sole and exclusive bargaining agent" for bargaining unit members. The Article 8 clauses at issue here read:

8.1 Individual Agreements.
        The Employer shall not enter into any agreement or contract with his employees, individually or collectively, which in any way conflicts with the terms and provisions of this Agreement. Any such Agreement or contract shall be null and void. All employees shall work in accordance with this Agreement. The Employer recognizes and acknowledges this Agreement.

8.2 Right to Representation by Union
        No Employee covered by this Agreement shall be requested to attend any meetings at which hours, wages or working conditions are to be discussed without a Business Agent or the Secretary-Treasurer of the Union being present.

External law provisions are also relevant to give life to these contract clauses. Under the labor laws, a Union that is a  bargaining unit's sole and exclusive

bargaining agent has certain legal rights. Among them are notice and an opportunity to bargain over mandatory subjects of bargaining, among which is health insurance.

The Company frequently told or wrote to employees that moving from the base plan to the premium plan was a voluntary employee act. The problem with that is that it does not deal with the Union's right to be told that Quality proposed coming up with an alternative health plan and was of the view that Article 13.6 would not apply to this alternative plan. Failure to even notify the Union of the possibility or existence of the premium plan meant that there was no opportunity to bargain over it.

There is no dispute over the failure of notice and bargaining opportunity here. Both Mr. Audet and Mr. Foley said that the Company had not invited the Union's Business Agent or Secretary-Treasurer to the September 2014 meeting. There was apparently also at least one other meeting after 2014, and no notice of that meeting was given to the Union. The Union took no action about the change in healthcare coverage until April 2017 when Mr. Foley first learned from the Company's response to a request he filed that premium plan employees were paying 28% or 32% of the cost of their health coverage, rather than the 20% or 25% cap in Article 13.6.

In addition, Article 8.2 specifically says that no employee covered by the contract shall be asked to attend any meeting where wages, hours, or working conditions are to be discussed unless a Business Agent or the Secretary-Treasurers of the Union is present. This clause was violated in September 2014 and, it seems, at least one other time when the Company gave no notice of the health insurance meetings to the Union.

Article 8.1, Individual Agreements, is strongly worded. It prohibits Quality from entering any agreement or contract with its employees, individually or collectively,

which in any way conflicts with the terms and provisions of the contract. The document that employees sign to move from the base to the premium plan is a Blue Cross Blue Shield document, not a Quality Beverages document. However, it is crystal clear from the facts that the Company's agreement with the employees was that it would process their premium plan applications if they got them in to Controller Brisson by a date Quality specified. There was also an unspoken agreement that the Company would pay health insurance premiums itself and withhold them from employees' paychecks.

### The Untimely Filed Grievance and Arbitrability

The incident that led to the grievance occurred in 2014 in connection with the new, unnegotiated premium plan. No grievance was filed until April 24, 2017. Article 19.2 requires that grievances be filed no longer than eight days after the incident that led to them. Under Article 19.6, when time limits are not met the grievance "shall be deemed null, void and waived." From this contract language, the Company argues that this case is procedurally inarbitrable. That means that an arbitrator has no jurisdiction to decide the case on the merits but must dismiss it on procedural grounds.

That would be the result in this case but for the reality that the facts here constitute a classic continuing violation situation. This happens when the incident giving rise to the grievance is not a single incident such as a termination when there is only one event. In contrast, continuing violations occur where an incident that can precipitate a grievance is repeated multiple times. Here, a violation occurred each time the employees paid their premiums that exceeded the Article 13 caps of 20% or 25%. That happened weekly when the premiums were deducted from employee

paychecks. Each deduction was potentially a new grievance.

The employees were never told that premium plan individuals were paying 28% or 32% of the cost of their health insurance. The Union's Business Agent was never told either. Situations such as this illustrate why Unions have an absolute right under the labor laws to notice and an opportunity to bargain over things such as new health insurance plans. Under those laws, an employer is simply not free to come up with a unilateral alternative health plan outside of the collective bargaining agreement that leads to employees incurring financial obligations beyond those to which they and their Union committed during contract negotiations.

It is certainly true that the new health plan became a known factor in the Fall of 2014 and the grievance was not filed for approximately 2 ½ years. That is indeed a significantly late filing. However, I am convinced that the complete picture of what happened here constitutes a sufficient reason for the late filing.

The Company argues in its brief that the Union had agreed to the new premium plan and is seeking in this case a windfall to recover premiums employees paid that were beyond the caps in Article 13.6. I cannot see that because the Union was never given notice of the new plan or a chance to bargain before it went into effect.

Also, the meetings on the plan that the Company held violated the contract in that they occurred without Union presence, and the 28% and 32% payments under the new plan clashed with the 20% and 25% caps existing in the collective bargaining agreement.

Then there is the factor that the Company never told the employees how much it was paying for the plans so they could not calculate what percent they were paying. It is true that people could have done a multi–step mathematical process

to ascertain what the Company was paying so that they could calculate the percent that they were paying. However, as Mr. Audet said, employees had no knowledge of the cost of the dental and vision plans for which the Company was also paying. Thus, even if they had done the calculations they would not have come out to the right figure because of the unavailability of the total financial picture.

It is true that the 2016-2017 Benefits Guide says in a table top line that the premiums listed included dental and vision, but there was no evidence at the hearing on this single table line in a long, complicated, multi-page document. Additionally, Mr. Audet said that the dental and vision costs were not made available to employees so attaching weight to this one-line table heading about which we know nothing seems unreliable.

There is also the factor that that table heading line does not appear in the 2015-2016 Benefits Guide. That document was not introduced for the 2014-2015 plan year. Finally, as the remedy section below indicates, finding this grievance to be arbitrable will not unduly burden Quality. Given all of these factors, it seems reasonable to me to find this an appropriate continuing violation situation.

## **Remedy**

As is the norm in continuing violation cases, the employees' financial remedy cannot date back to 2014 when the premier plan went into effect. Instead, it must be limited to starting eight days before the grievance was filed on April 24, 2017 and continuing through whatever period of medical insurance coverage employees were entitled to until the 2017-2022 collective bargaining agreement became effective. The eight days comes from the Article 19.2 requirement that grievances must be filed no longer than eight days after the incident giving rise to them.

## **AWARD**

1.) This grievance is a continuing violation which was timely filed on April 24, 2017;

2.) The Company violated Article 13.6 of the collective bargaining agreement commencing in the Fall of 2014 and continuing up to the new contract effective May 22, 2017;

3.) In accord with continuing violation procedures, the Company shall return to employees who paid them health plan overpayments beginning eight days before the April 24, 2017 grievance filing and continuing through whatever period of medical insurance coverage employees were entitled to until the 2017-2022 collective bargaining agreement became effective.

_____

Joan G. Dolan, Esq.
Arbitrator